## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| F-SQUARED INVESTMENT MANAGEMENT LLC, *et al.*, | Case No. 15-11469 (LSS) |
| Debtors. | Jointly Administered |

| | |
|---|---|
| Craig Jalbert, in his capacity as Trustee for F2 Liquidating Trust, | |
| Plaintiff, | |
| vs. | |
| Adrienne Souza, | Adv. Pro. No. 17-50716 (LSS) |
| Christine Martin, | Adv. Pro. No. 17-50723 (LSS) |
| David Souza, | Adv. Pro. No. 17-50725 (LSS) |
| F. Warren McFarlan, | Adv. Pro. No. 17-50752 (LSS) |
| John M. Weyand 2005 Trust, | Adv. Pro. No. 17-50797 (LSS) |
| Jon F. Holsteen Declaration of Trust, | Adv. Pro. No. 17-50799 (LSS) |
| Jonathan Stern, | Adv. Pro. No. 17-50802 (LSS) |
| Keith Jarrett, | Adv. Pro. No. 17-50848 (LSS) |
| Millennium Trust Company, LLC, | Adv. Pro. No. 17-50855 (LSS) |
| MMF-NH LLC, | Adv. Pro. No. 17-50856 (LSS) |
| Paul Martin, | Adv. Pro. No. 17-50858 (LSS) |
| Revocable Trust of Charles E. Jacobs, | Adv. Pro. No. 17-50861 (LSS) |
| Roberts Family 1998 Exempt Trust, | Adv. Pro. No. 17-50863 (LSS) |
| Sea View Investments LLC, | Adv. Pro. No. 17-50865 (LSS) |
| Thomas Roberts, | Adv. Pro. No. 17-50866 (LSS) |
| Thomas Littauer, | Adv. Pro. No. 17-50870 (LSS) |
| William Weyand, | Adv. Pro. No. 17-50877 (LSS) |
| Defendants. | Re: Adv. D.I. 1 |

## JOINT MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS COMPLAINT

Dated: November 13, 2017

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Eric D. Schwartz (DE Bar No. 3134)
1201 North Market Street
Wilmington, DE 19899
Tel: (302) 658-9200

— and —

SCHIFF HARDIN LLP
J. Mark Fisher, *pro hac vice*
Walter C. Greenough
233 S. Wacker Drive, Suite 7200
Chicago, IL 60606
Tel: (312) 258-5500

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ................... 1

SUMMARY OF THE ARGUMENT ............................................................... 1

INTRODUCTION ..................................................................................... 2

STATEMENT OF FACTS ......................................................................... 3

ARGUMENT .......................................................................................... 6

I.       Legal Standard ...................................................................... 6

II.      Plaintiff Fails to Allege a Plausible Constructive Fraudulent Transfer
         Claim Under Section 548(a) .................................................... 6

         A.       Plaintiff Fails to Adequately Allege Debtors Were Insolvent at the
                  Time of or as a Result of the Challenged Transfers .................... 7

                  1.       Plaintiff's Allegation of Insolvency is Conclusory and
                           Speculative ..................................................... 8

                  2.       Plaintiff's Allegation of Insolvency is Contradicted by
                           Other Allegations and by F-Squared's Admissions .............. 9

                  3.       Plaintiff Cannot Rely Upon Future Events to Allege
                           Insolvency ...................................................... 11

         B.       Plaintiff Fails to Adequately Allege that F-Squared Had
                  Unreasonably Small Capital ................................................ 12

         C.       Plaintiff Fails to Adequately Allege F-Squared Intended to Incur
                  Debts Beyond Its Ability to Pay ........................................... 15

III.     Plaintiff Fails to Allege a Plausible Constructive Fraudulent Transfer
         Claim Under Section 544(b) and State Law .................................. 16

IV.      Plaintiff Fails to Allege a Plausible Recovery Claim Under Section 550 ........... 16

CONCLUSION ....................................................................................... 17

# TABLE OF CITATIONS

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................... 6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................... 6

*In re Adelphia Comm'ns Corp.*,
    652 Fed App'x 19 (2d Cir. 2016) ............................... 13

*In re Aphton Corp.*,
    423 B.R. 76 (Bankr. D. Del. 2010) .............................. 7

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ...................................... 3

*In re Gluth Bros. Constr., Inc.*,
    424 B.R. 368 (Bankr. N.D. Ill. 2009) .......................... 9

*In re Kane & Kane*,
    No. 10-01022-EPK, 2013 WL 1197609 (Bankr. S.D. Fla. Mar. 25, 2013)................ 13

*In re Paris*,
    568 B.R. 810 (Bankr. C.D. Cal. 2017).......................... 4

*In re Pioneer Home Builders, Inc.*,
    147 B.R. 889 (Bankr. W.D. Tex. 1992)....................... 13

*In re SemCrude L.P.*,
    648 Fed. App'x 205 (3d Cir. 2016) ............................ 14

*In re THQ Inc.*,
    No. 12-13398(MFW), 2016 WL 1599798 (Bankr. D. Del. Apr. 18, 2016) ............... 16

*In re Trans World Airlines*,
    134 F.3d 188 (3d Cir. 1998) ...................................... 11

*In re Trinsum Group, Inc.*,
    460 B.R. 379 (S.D.N.Y. 2011)................................. 7, 8

*In re United Tax Group, LLC*,
    2016 WL 7235622 (Bankr. D. Del. Dec. 13, 2016)................................. 8, 16

*Innovative Custom Brands, Inc. v. Minor*,
    No. 15-CV-2955(AJN), 2016 WL 308805 (S.D.N.Y. Jan. 25, 2016) .......................... 7

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
    971 F.2d 1056 (3d Cir. 1992) ........................... 7, 11, 13

**Statutes**

11 U.S.C. § 544(b) ........................................................................................................ 2, 16

11 U.S.C. § 548 ................................................................................................................. 2

11 U.S.C. § 548(a)...................................................................................... 1, 2, 6, 7, 8, 16

11 U.S.C. § 548(a)(1)(B)(ii)(I)........................................................................................ 7, 9

11 U.S.C. § 548(a)(1)(B)(ii)(II) .......................................................................................... 12

11 U.S.C. § 548(a)(1)(B)(ii)(III) ......................................................................................... 15

11 U.S.C. § 550 ................................................................................................................. 16

11 U.S.C. § 550(a)............................................................................................................ 2, 16

Del. Code tit. 6, § 1304(a)................................................................................................. 16

Mass. Gen. Laws 190A § 5(a) ........................................................................................... 16

**Other Authorities**

5B Charles A. Wright et al., Fed. Prac. & Proc. Civil, § 1357 (3d ed. 2004)..................... 3

**Rules**

Fed. R. Bankr. P. 7012(b) ............................................................................................... 1, 6

Fed. R. Civ. P. 12(b)(6).................................................................................................... 1, 6

Defendants Adrienne Souza, Christine Martin, David Souza, F. Warren McFarlan, John M. Weyand 2005 Trust, Jon F. Holsteen Declaration of Trust, Jonathan Stern, Keith Jarrett, Millennium Trust Company, LLC, MMF-NH LLC, Paul Martin, Revocable Trust of Charles E. Jacobs, Roberts Family 1998 Exempt Trust, Sea View Investments LLC, Thomas Roberts, Thomas Littauer, and William Weyand ("Defendants"), by their undersigned counsel, submit this Joint Memorandum in support of their Motions to Dismiss Plaintiff's Complaint.[1]

### STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Plaintiff filed this adversary proceeding to avoid and recover certain transfers from the Debtors to Defendants on the theory that those transfers are constructively fraudulent.

This proceeding is still at the pleadings stage, and Defendants are moving to dismiss Plaintiff's Complaint.

### SUMMARY OF THE ARGUMENT

1.      Plaintiff's Complaint fails to plausibly allege a cause of action against Defendants, as is required under Fed. R. Civ. P. 12(b)(6), as applied to adversary proceedings by Fed. R. Bankr. P. 7012(b).

2.      Plaintiff's avoidance claim under Section 548(a) of the Bankruptcy Code merely parrots the statutory text without providing corroborating facts to establish constructive fraudulent transfer liability.  In particular, Plaintiff fails to plausibly allege facts demonstrating the Debtors were insolvent at the time of or as a result of the transfers to Defendants, that the Debtors were engaged in a business or transaction for which any

---

[1] The same Motion and Joint Memorandum are contemporaneously filed in all of the above-numbered adversary proceedings because those proceedings contain substantially identical complaints against the similarly situated Defendants.

property remaining after the transfers was unreasonably small capital, or that the Debtors intended to incur or believed they would incur debts beyond their ability to pay.

3.     Plaintiff's avoidance claims under Section 544(b) of the Bankruptcy Code and state law require proof of the same elements as his Section 548(a) claim.  Because Plaintiff's Section 548(a) claim fails, so too do these other avoidance claims.

4.     Because Plaintiff has not plausibly alleged any avoidance claim, he is not entitled to recover any avoided transfer under Section 550(a) of the Bankruptcy Code.

## INTRODUCTION

Plaintiff filed adversary proceedings to avoid and recover certain transfers from Debtors to Defendants on the theory that those transfers were constructively fraudulent. But instead of alleging facts to show Debtors were, in fact, insolvent at the time of the transfers, Plaintiff relies on the conclusion that, in hindsight, Debtors' actions were "almost certain, to give rise, at some point, to massive liabilities" that would render Debtors insolvent.  Such speculation cannot form the basis of an avoidance claim.  Nor were the transfers to Defendants the alleged cause of Debtors' insolvency.  Rather, Debtors' financial downfall was precipitated by a series of unforeseen intervening events, beginning with the SEC's issuing a cease-and-desist order and suing Debtors' investors months *after* the last transfers to Defendants were made.  In fact, the transfers to Defendants total less than $5 million; by comparison, the Debtors had approximately $28.5 billion in assets under advisement around the time the transfers were made.  Simply put, Plaintiff's allegations of little more than the text of Section 548 fail to plead any plausible claim against Defendants, and the Complaint should be dismissed.

## STATEMENT OF FACTS

Debtors F-Squared Investment Management, LLC and its subsidiaries (collectively, "F-Squared" or "Debtors") were investment management and research firms.  (Compl., ¶ 8.)  F-Squared created and licensed a series of specialty indexes (the "AlphaSector Indexes") based upon sector rotation strategies that used quantitative models programmed to measure the volatility and price movements of exchange-traded funds as criteria for inclusion and weighting in the indexes.  (*Id.*, ¶ 13.)  By 2014, a substantial majority of F-Squared's revenues was based on fees generated by the AlphaSector Indexes.  (*Id.*, ¶ 16.)

Defendants were unitholders of F-Squared.  (*Id.*, ¶ 6.)  Attached as **Exhibit A** is a list of transfers of tax and profit distributions (the "Transfers") made to each of the Defendants from August 29, 2013 to September 8, 2014, as alleged by Plaintiff.  The total amount of all of the Transfers to Defendants is under $5 million.

On December 22, 2014, more than three months *after* the last of Transfers was made to Defendants, F-Squared agreed to the Securities and Exchange Commission's ("SEC") issuing a cease-and-desist order (the "SEC Order") imposing $35 million in penalties.  (*Id.*, ¶ 14.)  The SEC Order contained the following admissions by F-Squared:[2]

- The AlphaSector Indexes were implemented beginning in October 2008.

- As of June 30, 2014, there was approximately $28.5 billion invested pursuant to the AlphaSector Indexes.

---

[2] A copy of the SEC Order is attached as **Exhibit B**.  Because the SEC Order is "integral to or explicitly relied upon" in the Complaint, it is appropriate for the Court to consider the SEC Order in deciding Defendants' Motion to Dismiss, and doing so would not convert the motion to one for summary judgment.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations omitted); *see also* 5B Charles A. Wright et al., Fed. Prac. & Proc. Civil § 1357 (3d ed. 2004) ("The court is not limited to the four corners of the complaint" and may consider "matters incorporated by reference or integral to the claim").

- In advertising the AlphaSector Indexes, F-Squared made two materially false claims: (1) that the quantitative models that formed the basis of the AlphaSector strategy had been used to manage actual client assets from April 2001 to September 2008; and (2) that use of the same models demonstrated a track record that significantly outperformed the S&P 500 Index from April 2001 to September 2008.

- The AlphaSector Indexes relied on an inaccurate compilation of historical data that inflated their advertised performance.  If an investor made a hypothetical investment of $100,000 on April 1, 2001 in the S&P 500 Index, the investment would have been worth approximately $128,000 on August 24, 2008.  The same $100,000 hypothetical investment using F-Squared's AlphaSector strategy would have yielded $138,000 in the same time period.  However, F-Squared, using faulty performance calculations, advertised the same $100,000 investment yielding $235,000 in returns under the AlphaSector strategy.

Following entry of the SEC Order, Plaintiff alleges the following events occurred:

- Due to its $35 million payment to the SEC, F-Squared had limited ability to make its payroll and pay its debts as they thereafter came due.  (Compl., ¶ 16.)

- F-Squared's clients stopped using its algorithms to manage their assets. (*Id.*, ¶ 17.)  By March 31, 2015, four of F-Squared's largest clients notified it that they were terminating their relationships, representing a loss of $4.3 billion, which was more than 25% of F-Squared's assets under management.  (*Id.*, ¶ 18.)

- The SEC opened investigations into F-Squared's clients arising from their use of the AlphaSector strategy, which further incentivized those clients to leave F-Squared.  (*Id.*, ¶ 19.)

- In response to the substantial loss of business, Debtors reduced their workforce by nearly 30% in March 2015.  (*Id.*, ¶ 20.)  This workforce reduction resulted in Debtors' incurring an additional $1.3 million in severance costs.  (*Id.*)

These allegations of post-SEC Order events are substantially based on the

Declaration of David N. Phelps, F-Squared's Chief Restructuring Officer, which was filed

at the same time as F-Squared's bankruptcy petition (the "First-Day Declaration").[3]  (D.I.

---

[3] The factual assertions in the First-Day Declaration were made under penalty of perjury and constitute judicial admissions.  *In re Paris*, 568 B.R. 810, 820 (Bankr. C.D. Cal. 2017).

3.)  However, Plaintiff omits other facts admitted in the First-Day Declaration that further show the Debtors' alleged financial difficulties occurred *after* the Transfers were made and arose from intervening events *unrelated* to the Transfers:

- Until the SEC proceeding, F-Squared outpaced all of its rivals in assets under advisement.  (First-Day Decl., ¶ 20.)

- As a result of the SEC Order and its resulting loss of customers, F-Squared retained PL Advisors in March 2015 as its investment banker and financial advisor, and initially charged it with pursuing a recapitalization plan.  (*Id.*, ¶ 24.)

- It was only after May 2015, when Virtus Investment Partners, Inc. ("Virtus"), one of F-Squared's customers that was also investigated by the SEC, terminated its relationship with F-Squared that F-Squared's board determined that a sale of the company's assets rather than a capital raise was the better course of action in maximizing the value of the company.  (*Id.*, ¶ 26.)

- A week before F-Squared filed bankruptcy, based on feedback received by certain bidders and an analysis of the then-existing circumstances, F-Squared's board made the decision to pursue a sale process pursuant to Section 363 of the Bankruptcy Code.  (*Id.*, ¶ 28.)

- F-Squared claimed that as of July 8, 2015, "[t]he Debtors have adequate financial and human resources to maintain their business as a going concern throughout these Chapter 11 Cases in order to maximize value for their estates and creditors."  (*Id.*, ¶ 38.)

Ultimately, Debtors filed for Chapter 11 bankruptcy relief on July 8, 2015. (Compl., ¶ 21.)  On October 28, 2015, Debtors and the official committee of unsecured creditors filed a joint plan of organization (the "Plan"), which Plan was confirmed.  (*Id.*, ¶ 23.)  Pursuant to the Plan, the F2 Liquidating Trust (the "Liquidating Trust") was established, and Plaintiff, as the trustee of the Liquidating Trust, was given power to pursue all causes of action not released, compromised, and/or settled.  (*Id.*, ¶¶ 24-25.)

Plaintiff then filed adversary proceedings against Defendants and others.  Plaintiff claims that Debtors' Transfers to Defendants were constructively fraudulent and seeks to avoid the Transfers and recover their value from Defendants.  (*Id.*, ¶¶ 29-42.)

## ARGUMENT

### I.    Legal Standard.

A complaint that fails to state a claim upon which relief can be granted should be dismissed.  Fed. R. Civ. P. 12(b)(6); *see also* Fed. R. Bankr. P. 7012(b) (applying Rule 12 to adversary proceedings).

To survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id.*

In assessing plausibility, the court is guided by two principles.  First, "threadbare recitals of a cause of action's elements, supported by mere conclusory statements" are insufficient.  *Id.*  Second, "determining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw upon its experience and common sense."  *Id.*

### II.   Plaintiff Fails to Allege a Plausible Constructive Fraudulent Transfer Claim Under Section 548(a).

Plaintiff claims that F-Squared's Transfers to Defendants were constructively fraudulent under one of three theories: (1) F-Squared was insolvent on the date of the Transfers or became insolvent as a result of the Transfers; (2) F-Squared was engaged in a business or transaction for which any property remaining was unreasonably small capital;

or (3) F-Squared intended to incur or believed it would incur debts that would be beyond its ability to pay as those debts matured.  (Compl., ¶ 32.)  All of these theories merely parrot the statutory language of Section 548(a) and—as shown by Plaintiff's inability to specify which theory fits—none is supported by the facts alleged in the Complaint or by F-Squared's admissions in the SEC Order and First-Day Declaration.

### A.    Plaintiff Fails to Adequately Allege Debtors Were Insolvent at the Time of or as a Result of the Challenged Transfers.

Plaintiff fails to plausibly allege that F-Squared was insolvent at the time of or as a result of the Transfers.  11 U.S.C. § 548(a)(1)(B)(ii)(I); *In re Aphton Corp.*, 423 B.R. 76, 90 (Bankr. D. Del. 2010).  "Insolvency is determined 'as of the time of the conveyance.'" *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1066 (3d Cir. 1992) (internal citation omitted); *see also In re Trinsum Group, Inc.*, 460 B.R. 379, 392 (S.D.N.Y. 2011) ("The operative reference point for determining insolvency is at the time at which the transfer took place" and "[t]herefore, insolvency of the transferor for the purposes of the statute cannot be presumed from subsequent insolvency at a later point in time").  To make this determination, the Court must be provided with balance sheet or other information to allow it to determine whether the debtor's liabilities exceeded its assets at the time of each challenged transfer.  *In re Trinsum Group*, 460 B.R. at 392.

Here, the Complaint provides no information about F-Squared's assets or debts at the time of the Transfers (or at any given time at all) to show F-Squared was insolvent. Plaintiff's general allegations regarding F-Squared's financial difficulties after the SEC Order was entered are not adequate substitutes for balance sheet information demonstrating insolvency.  *See*, *e.g.*, *Innovative Custom Brands, Inc. v. Minor*, No. 15-CV-2955 (AJN), 2016 WL 308805, at *3 (S.D.N.Y. Jan. 25, 2016) (dismissing claim where allegation that

debtor was experiencing "serious financial distress" failed to provide balance sheet information to show debtor's liabilities exceeded its assets); *In re Trinsum Group*, 460 B.R. at 392-393 (dismissing claim where allegations of revenue declining by 43% and debt levels rising 75% were insufficient to show balance sheet insolvency).  The only relevant financial information that Plaintiff provides is that as of June 30, 2014, F-Squared had approximately $28.5 billion in assets under management.  (Compl., ¶ 13.)  That was approximately two months before the last of the Transfers, which totaled less than $5 million.  (Ex. A.)  On these facts, it is not plausible that F-Squared was insolvent at the time of the Transfers or became insolvent as a result of them.

In fact, Plaintiff's allegation regarding F-Squared's alleged insolvency is limited to the following sentence: "Thus, at all relevant times, F-Squared generated a great majority of its revenue by means of illegal activity almost certain to give rise, at some point, to massive liabilities on account of that activity, and so F-Squared was insolvent from the inception of its use of the AlphaSector Index strategy."  (*Id.*, ¶ 16.)  This allegation is insufficient for many reasons.

### 1. Plaintiff's Allegation of Insolvency is Conclusory and Speculative.

Plaintiff's allegation of insolvency is entirely conclusory.  In *In re United Tax Group, LLC*, this Court found the allegation that "[t]he Debtor's records, including the Debtor's tax returns, suggest that the Debtor was insolvent on a 'balance sheet' basis" was "too conclusory" to state a plausible Section 548(a) claim and dismissed the claim.  *Id.*, 2016 WL 7235622, at *4 (Bankr. D. Del. Dec. 13, 2016).  The Court should grant the same relief here.

Moreover, Plaintiff's conclusion that F-Squared *was* insolvent is based on speculation, not facts.  That F-Squared's activities were purportedly "almost certain to give rise, at some point" to liabilities, establishes, at most, only the *possibility* of insolvency. *See also In re Gluth Bros. Constr., Inc.*, 424 B.R. 368, 377 (Bankr. N.D. Ill. 2009) (dismissing constructive fraudulent transfer claim where "the complaint merely gives a formulaic recitation of [insolvency]" and noting that "[a]s the creditor trustee, the Plaintiff should have enough access to information on the Debtor's finances to be able to allege at least some minimal factual support for its allegation").

> ### 2.    Plaintiff's Allegation of Insolvency is Contradicted by Other Allegations and by F-Squared's Admissions.

Aside from the lone, defective allegation of insolvency in paragraph 16 of the Complaint, Plaintiff alleges no facts demonstrating that F-Squared was insolvent as of the dates that the Transfers were made to Defendants, or that F-Squared became insolvent as a result of the Transfers.  11 U.S.C. 548(a)(1)(B)(ii)(I).  In fact, the chronology Plaintiff alleges shows just the opposite.  F-Squared's Transfers to Defendants were all made between August 29, 2013 and September 8, 2014.  (Ex. A.)  The SEC Order was not entered until December 2014, months *after* the last of the Transfers had already been made. (Compl., ¶ 14.)  And Debtors' Chapter 11 petitions were not filed until more than half a year later, in July 2015.  (*Id.*, ¶ 21.)

Moreover, Plaintiff's allegation that "F-Squared was insolvent from the inception of its use of the AlphaSector Index strategy" is directly contradicted by its allegation that "*[a]s a result* of the [SEC] Order, F-Squared was no longer a viable business and was no longer able to operate with its remaining capital."  (*Compare* Compl., ¶ 16 *with* ¶ 21 (emphasis added).)  Under the latter allegation, the Transfers are not fraudulent because

they were made months *before* F-Squared became insolvent and *before* the SEC Order caused that insolvency.

Aside from this contradiction, the allegation that F-Squared was insolvent from the outset of its use of the AlphaSector strategy is patently false.  Plaintiff does not actually allege when this strategy was first implemented, but F-Squared admits in the SEC Order that this was done in October 2008.  (Ex. B.)  Clearly, F-Squared could not have been insolvent as of that date because it did not file bankruptcy until July 2015—almost 7 years later.  (Compl., ¶ 7.)  Indeed, it had its highpoint of $28.5 billion in customer assets invested under the strategy in mid-2014 at approximately the time of the last Transfer and met all of its obligations through the end of that year, long after the Transfers were made.

Plaintiff's allegation of insolvency is based on an inaccurate representation of the circumstances resulting in the SEC Order.  It was not F-Squared's "use of the AlphaSector Index strategy" that was "illegal," giving rise to the SEC's SEC Order.  Indeed, there was nothing illegal about *using* the AlphaSector Index strategy.  Rather, as is evident from the SEC Order, F-Squared's liability stemmed from how it *advertised* the strategy.  (Ex. B.)

That only F-Squared's advertising of its AlphaSector strategy—and not the strategy itself—was problematic is another fatal flaw in Plaintiff's theory.  Plaintiff does not (and cannot) allege that F-Squared's business in licensing the AlphaSector strategy was illegal from the outset and was bound to fail.  This was not a Ponzi scheme; the AlphaSector strategy was applied to and yielded actual market returns.  Indeed, as F-Squared admitted in the SEC Order, the AlphaSector strategy *outperformed* the S&P 500 Index.  A theoretical $100,000 investment made in April 2001 would have increased by August 2008 to

$128,000 if invested in the S&P 500 Index and to $138,000—$10,000 more—if invested in the AlphaSector Indexes. (Ex. B.)

By the time the Transfers had been made to Defendants, F-Squared had used the AlphaSector strategy for *6 years* and generated actual attractive returns. These returns, not earlier advertising of F-Squared's pre-2008 trading, are the reason why clients maintained $28.5 billion in investments with F-Squared. (Compl., ¶ 13.) Under these circumstances, it is not plausible that F-Squared would inevitably lose its clients' confidence and fail. Yet, this is all Plaintiff alleges as the sole foundation of his insolvency claim.

### 3.    Plaintiff Cannot Rely Upon Future Events to Allege Insolvency.

Unable to avoid the fact that F-Squared was balance sheet solvent as of the time of the Transfers, Plaintiff retreats to the theory that F-Squared was nonetheless insolvent because its conduct was "almost certain to give rise, at some point, to massive liabilities" that would render it insolvent. (Compl., ¶ 16.) This post hoc theory relies on impermissible hindsight bias.

The Third Circuit has rejected attempts to use future events not known or foreseeable by a debtor to establish insolvency. *See Moody*, 971 F.2d at 1067 ("Where bankruptcy is not 'clearly imminent' on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis" even though the debtor's business dried up in later years); *see also In re Trans World Airlines*, 134 F.3d 188, 193, 198 (3d Cir. 1998) ("Rather, contingent liabilities must be limited to costs arising from foreseeable events that might occur while the debtor remains a going concern" where "liquidation in bankruptcy was not clearly imminent on the date of the challenged transfer").

Here, at the time that it made the Transfers to Defendants between August 29, 2013 and September 9, 2014 (Ex. A), F-Squared did not know and could not have foreseen all of the intervening events to come arising from the actions of third parties outside its control:

- SEC imposing $35 million in penalties under the SEC Order;

- SEC commencing a civil action against F-Squared's former CEO;

- SEC commencing investigative proceedings against F-Squared's clients;

- News outlets publishing negative publicity;

- Clients stopping their use of the AlphaSector strategy; and

- Clients terminating their relationships with F-Squared.

(Compl., ¶¶ 14-19.)

As of June 30, 2014 (only 70 days before the last of the alleged Transfers to Defendants), there was approximately $28.5 billion invested by F-Squared's clients pursuant to its AlphaSector strategy. (Ex. A; Compl., ¶ 13.) A year later, F-Squared was bankrupt. (Compl., ¶ 21.) Plaintiff has not alleged the requisite factual support for his suggestion that F-Squared should have anticipated all of the intervening events that led to this ultimate result. F-Squared was not clairvoyant and could not foresee at the time of the Transfers that the failure of its booming business and evaporation of its mountain of cash was "clearly imminent." Thus, Plaintiff's theory fails to meet the high degree of foreseeability that the case law demands.

### B. Plaintiff Fails to Adequately Allege that F-Squared Had Unreasonably Small Capital.

There is no factual support for Plaintiff's contention that F-Squared was engaged in a business or transaction for which any property remaining with the Debtors was an unreasonably small capital. 11 U.S.C. 548(a)(1)(B)(ii)(II). "[U]nreasonably small capital

denotes a financial condition short of equitable insolvency" and the test for that is "reasonable foreseeability." *Moody*, 971 F.2d at 1070, 1073; *see also In re Adelphia Comm'ns Corp.*, 652 Fed App'x 19, 21 (2d Cir. 2016) (unreasonably small capital describes a situation where the debtor is "technically solvent but doomed to fail" with insolvency being "inevitable in the reasonably foreseeable future") (internal citations omitted).

A plaintiff must show that the challenged transfers caused the lack of sufficient capital. *In re Kane & Kane*, No. 10-01022-EPK, 2013 WL 1197609, at *10 (Bankr. S.D. Fla. Mar. 25, 2013) ("Under both federal and Florida law, there must be a causal relationship between the Transfers and the likelihood that the Debtor's business will fail."); *In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992) ("For avoidance purposes, both the Bankruptcy Code and TUFTA require that the disputed transfers *cause* the unreasonably small capital condition") (emphasis in original).

Plaintiff cannot meet these requirements for four reasons. First, Plaintiff does not allege how much capital F-Squared had either before or after the Transfers to support his conclusion that the Transfers caused F-Squared to have insufficient capital.

Second, Plaintiff cannot mask his failure to plead how much F-Squared had in capital before and after the Transfers by retreating to the theory that F-Squared was insolvent from the very beginning. This insolvency from the outset theory is wholly incompatible with Plaintiff's allegation that that the subsequent Transfers *caused* F-Squared to have unreasonably small capital. *See In re Kane & Kane*, 2013 WL 1197609, at *10 ("If a debtor is doomed to fail prior to a transfer, the transfer does not create the likelihood of such failure, and the statutory test is not satisfied.").

Third, as discussed above, the Transfers were not of the order of magnitude that would have caused F-Squared to have insufficient capital.  The total sum of the Transfers, which took place over the course of a year from August 2013 to September 2014, was less than $5 million.  (Ex. A.)  According to the Complaint, as of June 2014, F-Squared had $28.5 billion in assets under management.  (Compl., ¶ 13.)  According to the First-Day Declaration, even in March 2015, half a year after the last of the Transfers was made, F-Squared still had over $16 billion in assets under management.  (First-Day Decl., ¶ 6.) These facts do not present a plausible theory for the Transfers causing any capital issues.

Fourth, in *In re SemCrude L.P.*, the Third Circuit held that a bankruptcy trustee cannot rely on hindsight bias to establish unreasonably small capital.  *Id.*, 648 Fed. App'x 205, 211 (3d Cir. 2016).  There, the trustee sought to set aside equity distributions made by the debtor energy company, and at issue was whether the debtor would have been able to draw upon a credit facility, which, if it did, would have left it adequately capitalized.  *Id.* at 210.  The trustee argued, based on the fact that the debtor was *ultimately* unable to access the facility due to its allegedly improper trading strategies, which violated its credit agreement, that it was unreasonable for the debtor to rely on its ability to draw upon its line of credit *at the time* it made the challenged distributions.  *Id.*  The bankruptcy court rejected this theory, reasoning that "there is a temptation … to use hindsight to establish whether a debtor was adequately capitalized, and … that's a temptation to be avoided, because it would improperly expand fraudulent conveyance law far beyond its proper borders."  *Id.* Both the district court and Third Circuit agreed with this analysis, with the Third Circuit holding that "[a]bsent the bias of hindsight, it simply cannot be said that SemGroup was

likely to be denied access to a credit facility that had been in place while it was engaging in the allegedly improper trading strategy." *Id.* at 211.

Here, similarly to *In re SemCrude*, Plaintiff cannot rely on F-Squared's ultimate insolvency to argue that F-Squared had unreasonably small capital at the time it made the Transfers to Defendants. As discussed above, Plaintiff has not alleged facts demonstrating that F-Squared could reasonably foresee a "clearly imminent" business failure. To the contrary, the Complaint's allegations show that the Debtors' financial downfall occurred many months after the Transfers and resulted, not from the Transfers, but from an intervening series of events beginning months after the last of the Transfers was made.

### C. Plaintiff Fails to Adequately Allege F-Squared Intended to Incur Debts Beyond Its Ability to Pay.

Plaintiff has not plausibly alleged that F-Squared intended to incur or believed it would incur debts that would be beyond its ability to pay. 11 U.S.C. 548(a)(1)(B)(ii)(III). As discussed above, Plaintiff has not established that F-Squared was inadequately capitalized at the time it made the Transfers to Defendants, and there is no alleged basis for F-Squared to suspect it would be unable to pay its debts.

Moreover, F-Squared's admissions in the First-Day Declaration demonstrate that it had every intention of moving forwards as a going concern despite the difficulties caused by the SEC Order. In March 2015, six months after the last of the Transfers and four months before it filed bankruptcy, F-Squared retained an investment banker and financial advisor to raise capital, and it made progress on that goal, including getting twenty-six interested parties to execute nondisclosure agreements. (First-Day Decl., ¶¶ 24-25.) It was not until Virtus terminated its relationship with F-Squared in May 2015 that F-Squared's board decided to pursue an asset sale through bankruptcy. (*Id.*, ¶¶ 26, 28.) The

intervening actions of the SEC and of F-Squared's customers happened many months *after* the last of the Transfers was made; bankruptcy was not "clearly imminent" at the time. F-Squared had no expectation that it would be unable to pay its debts when it made the Transfers.

Because Plaintiff has not alleged a plausible claim for constructive fraudulent transfer under Section 548(a), Count I of his Complaint should be dismissed.

### III.     Plaintiff Fails to Allege a Plausible Constructive Fraudulent Transfer Claim Under Section 544(b) and State Law.

Plaintiff's avoidance claim under Section 544(b) of the Bankruptcy Code and state law requires proof of the same elements as his Section 548(a) claim. *Compare* 11 U.S.C. § 548(a) *with* Mass. Gen. Laws 190A § 5(a) *and* Del. Code tit. 6, § 1304(a). For the same reasons discussed above, this avoidance claim fails as well. *See In re United Tax Group*, 2016 WL 7235622, at *5 (dismissing state law constructive fraudulent transfer claim where Section 548(a) constructive fraudulent transfer claim failed). Thus, Count II should also be dismissed.

### IV.     Plaintiff Fails to Allege a Plausible Recovery Claim Under Section 550.

Because Plaintiff has not adequately alleged any avoidance claims, he is not entitled to recovery of any avoided transfer. 11 U.S.C. § 550(a) (allowing for recovery only "to the extent that a transfer is avoided"); *In re United Tax Group*, 2016 WL 7235622, at *5 (dismissing Section 550(a) recovery claim where plaintiff had no plausible avoidance claims); *In re THQ Inc.*, No. 12-13398 (MFW), 2016 WL 1599798, at *4 (Bankr. D. Del. Apr. 18, 2016) (same). Therefore, Count III of the Complaint should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiff's Complaint in its entirety.

Dated: November 13, 2017

Respectfully submitted,

*/s/ Eric D. Schwartz*
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Eric D. Schwartz (DE Bar No. 3134)
1201 North Market Street
Wilmington, DE 19899
Tel: (302) 658-9200

— and —

SCHIFF HARDIN LLP
J. Mark Fisher, *pro hac vice pending*
Walter C. Greenough
233 S. Wacker Drive, Suite 7200
Chicago, IL 60606
Tel: (312) 258-5500

*Counsel for Defendants*