## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| F-SQUARED INVESTMENT MANAGEMENT LLC, *et al.*, | Case No. 15-11469 (LSS) |
| Debtors. | Jointly Administered |

| | |
|---|---|
| Craig Jalbert, in his capacity as Trustee for F2 Liquidating Trust, | |
| Plaintiff, | |
| vs. | |
| Adrienne Souza, | Adv. Pro. No. 17-50716 (LSS) |
| Christine Martin, | Adv. Pro. No. 17-50723 (LSS) |
| David Souza, | Adv. Pro. No. 17-50725 (LSS) |
| F. Warren McFarlan, | Adv. Pro. No. 17-50752 (LSS) |
| John M. Weyand 2005 Trust, | Adv. Pro. No. 17-50797 (LSS) |
| Jon F. Holsteen Declaration of Trust, | Adv. Pro. No. 17-50799 (LSS) |
| Jonathan Stern, | Adv. Pro. No. 17-50802 (LSS) |
| Keith Jarrett, | Adv. Pro. No. 17-50848 (LSS) |
| Millennium Trust Company, LLC, | Adv. Pro. No. 17-50855 (LSS) |
| MMF-NH LLC, | Adv. Pro. No. 17-50856 (LSS) |
| Paul Martin, | Adv. Pro. No. 17-50858 (LSS) |
| Revocable Trust of Charles E. Jacobs, | Adv. Pro. No. 17-50861 (LSS) |
| Roberts Family 1998 Exempt Trust, | Adv. Pro. No. 17-50863 (LSS) |
| Sea View Investments LLC, | Adv. Pro. No. 17-50865 (LSS) |
| Thomas Roberts, | Adv. Pro. No. 17-50866 (LSS) |
| Thomas Littauer, | Adv. Pro. No. 17-50870 (LSS) |
| William Weyand, | Adv. Pro. No. 17-50877 (LSS) |
| Defendants. | Re: Adv. D.I. 1 |

## DEFENDANTS' REPLY IN SUPPORT OF
## THEIR MOTION TO DISMISS COMPLAINT

Dated: January 18, 2018        Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Eric D. Schwartz (DE Bar No. 3134)
1201 North Market Street
Wilmington, DE 19899
Tel: (302) 658-9200

— and —

SCHIFF HARDIN LLP
J. Mark Fisher, *pro hac vice*
Walter C. Greenough
233 S. Wacker Drive, Suite 7200
Chicago, IL 60606
Tel: (312) 258-5500

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

ARGUMENT ........................................................................................................ 2

I.    Plaintiff's Complaint Must Meet the *Twombly*/*Iqbal* Plausibility Standard.......... 2

II.   Plaintiff Cannot Rely on Factual Assertions Not Alleged in the Complaint ......... 2

III.  Plaintiff Fails to Allege a Plausible Claim Under Section 548(a) ........................ 3

    A.    Plaintiff Fails to Adequately Allege F-Squared Intended to Incur Debts Beyond Its Ability to Pay ................................................ 4

    B.    Plaintiff Fails to Adequately Allege F-Squared Was Undercapitalized ................................................................ 4

    C.    Plaintiff Fails to Adequately Allege F-Squared Was Insolvent at the Time of or as a Result of the Transfers to Defendants........................ 5

        1.    Insolvency Must Be Plausibly Alleged......................................... 6

        2.    Plaintiff's Allegations Do Not Plead a Plausible Case for F-Squared's Insolvency .................................................. 7

            i.    Plaintiff Confuses Impermissible Hindsight Bias With Permissible Use of Subsequently Discovered Information ...................................................... 9

            ii.   Plaintiff Cannot Use the SEC's Actions to Show F-Squared Was Inevitably Doomed ................................... 10

            iii.  Properly Discounted, F-Squared's Contingent Liabilities Did Not Render It Insolvent .......................... 12

IV.   Plaintiff Fails to Allege Plausible Claims Under Section 544(b) and State Law and Section 550........................................................... 15

CONCLUSION.................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................................... 1, 2, 6, 7

*Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*,
    836 F.2d 173 (3d Cir. 1988) ...................................................................... 3

*Federico v. Home Depot*,
    507 F.3d 188 (3d Cir. 2007) ....................................................................... 3

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ..................................................................... 2, 7

*In re Adelphia Comm'ns Corp.*,
    512 B.R. 447 (Bankr. S.D.N.Y. 2014) ................................................. 14, 15

*In re Charys Holding Co., Adv.*,
    No. 10-50211, 2010 WL 2788152 (Bankr. D. Del. July 10, 2010) ............................. 3

*In re DBSI, Inc.*,
    447 B.R. 243 (Bankr. D. Del. 2011) ............................................................. 6

*In re Edgewater Med. Ctr.*,
    373 B.R. 845 (Bankr. N.D. Ill. 2007) ....................................................... 9, 10

*In re Frenville Co., Inc.*,
    744 F.2d 332 (3d Cir. 1984) .................................................................... 12

*In re Grossman's Inc.*,
    607 F.3d 114 (3d Cir. 2010) .................................................................... 12

*In re Pioneer Home Builders, Inc.*,
    147 B.R. 889 (Bankr. W.D. Tex. 1992) ....................................................... 4

*In re R.M.L., Inc.*,
    92 F.3d 139 (3d Cir. 1996) ..................................................................... 12

*In re Trans World Airlines, Inc.*,
    134 F.3d 188 (3d Cir. 1998) ................................................................. 9, 12

*In re United Tax Group, LLC, Adv.*,
    No. 16-50088, 2016 WL 7235622 (Bankr. D. Del. Dec. 13, 2016) ....................... 6, 8

*In re Xonics Photochemical, Inc.*,
    841 F.2d 198 (7th Cir. 1988) .................................................................. 13

*Kixmiller v. Sec. & Exch. Comm'n*,
    492 F.2d 641 (D.C. Cir. 1974) ................................................................ 11

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
    971 F.2d 1056 (3d Cir. 1992) ................................................................... 4

*Paloian v. LaSalle Bank, N.A.*,
   619 F.3d 688 (7th Cir. 2010) .................................................................................. 12

**Statutory Authorities**

11 U.S.C. § 101(32) ........................................................................................................... 6

11 U.S.C. 548(a)(1)(B)(ii) ................................................................................................. 3

11 U.S.C. 548(a)(1)(B)(ii)(I) ............................................................................................. 5

15 U.S.C. § 78u(a) ............................................................................................................ 11

**Rules and Regulations**

Fed. R. Civ. P. 8(a)............................................................................................................. 2

**Additional Authorities**

*Black's Law Dictionary* (10th ed. 2014)......................................................................... 12

## INTRODUCTION

In his Opposition to Defendants' Motion to Dismiss,[1] Plaintiff impermissibly adds facts not found in the Complaint to support his contention that F-Squared was "insolvent from the inception." (*Compare* Compl. *with* Opp. at 2-10.)   But even if the Court were to consider Plaintiff's new facts (which it should not), they would not push Plaintiff's claims "across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007), because Plaintiff's theory suffers from two fatal flaws.

First, none of the extraneous material Plaintiff introduces in his Opposition reconciles his theory that F-Squared was "insolvent *from the inception*" with his contradictory allegation that "*[a]s a result of the [SEC] Order*, F-Squared was no longer a viable business and was no longer able to operate with its remaining capital." (Compl., ¶¶ 16, 21 (emphasis added).)   At the time F-Squared made the challenged Transfers to Defendants (between August 2013 and September 2014), it had over $28 billion invested pursuant to its indexes, and those indexes outperformed the S&P 500.  (Compl., ¶ 13; Mem., Exs. A, B at 2.)   Whatever financial problems F-Squared had following entry of the SEC Order in December 2014 (Compl., ¶ 14) did not render it insolvent at the earlier time of the Transfers.   Assuming the truth of Plaintiff's allegation that F-Squared was "no longer a viable business" *because* of the SEC's Order, the only permissible inference is that F-Squared *was* a viable business at the time the Transfers were made.

The second flaw in Plaintiff's "insolvent from the inception" theory is that it relies upon F-Squared having "massive liabilities" to the SEC pursuant to the SEC Order (as alleged in the Complaint) and to clients pursuant to indemnification obligations (which are not alleged).  (Opp. at 2, 5-9, 18-19.)   Plaintiff improperly uses hindsight bias to treat those *contingent* liabilities as

---

[1] Identical Motions, supporting Memorandums, Oppositions, and Replies are filed in each of the above-numbered adversary proceedings.  Unless otherwise stated, capitalized terms have the meanings stated in Defendants' Memorandum.

*certainties* for purposes of determining F-Squared's solvency at the time of the Transfers. Properly discounted, those contingent liabilities did not render F-Squared insolvent. As a result, the Complaint should be dismissed in its entirety.

## ARGUMENT

**I.    Plaintiff's Complaint Must Meet the *Twombly/Iqbal* Plausibility Standard.**

Under *Bell Atl. Corp. v. Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the pleading standard under Fed. R. Civ. P. 8(a) "shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). *Iqbal* requires that a complaint be facially plausible, *Iqbal*, 556 U.S. at 662, and Plaintiff cannot sidestep that requirement by omitting it from his discussion of the applicable legal standard. (*See* Opp. at 11-13.)

Plaintiff is not entitled to a lower pleading standard by virtue of his being a third-party to the facts and circumstances underlying the Complaint. (Opp. at 12.) Plaintiff relies on *In re Liberty State Benefits of Del., Inc.*, but there, the bankruptcy court applied a slightly relaxed standard under Rule 9(b) for RICO claims involving fraud while analyzing all other claims under the *Twombly/Iqbal* framework. *Id.*, 541 B.R. 219, 233-234 (Bankr. D. Del. 2015). Plaintiff acknowledges that his claims are governed by Rule 8(a), not Rule 9(b), and thus *Liberty* does not apply. (*See* Opp. at 11.) The Complaint must comport with *Twombly/Iqbal*. It does not.

**II.    Plaintiff Cannot Rely on Factual Assertions Not Alleged in the Complaint.**

Plaintiff's Complaint lacks sufficient factual allegations to render his claims facially plausible, as shown by Plaintiff's attempt to redraft the Complaint in the "Factual Background" section of his Opposition. (Opp. at 2-10.) This section contains myriad new factual allegations that are not found in the actual Complaint. (*Compare* Opp. at 2-10 *with* Compl.) Plaintiff

acknowledges that "[s]ome additional facts were derived from additional information obtained by the Trustee," but he does not identify the source(s) of that information.  (Opp. at 2 n.4.)

"When considering a motion to dismiss, 'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'"  *In re Open Range Comm'ns, Inc.*, Adv. No. 12-50476 (KJC), 2013 WL 542471, at *3 (Bankr. D. Del. Feb. 12, 2013) (citing *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)); *see also Federico v. Home Depot*, 507 F.3d 188, 201 (3d Cir. 2007) ("[W]e do not consider after-the-fact allegations in determining the sufficiency of [plaintiff's] complaint"); *In re Charys Holding Co.*, Adv. No. 10-50211, 2010 WL 2788152, at *5 (Bankr. D. Del. July 10, 2010) ("Plaintiffs' representations in their Response [to a motion to dismiss] cannot remedy deficient fact pleading.").

The Court should focus on the allegations that are in the Complaint when assessing the sufficiency of that pleading, and it should ignore the new and unattributed allegations in Plaintiff's Opposition.   In particular, Plaintiff's assertions regarding F-Squared's supposed indemnification liabilities to its financial clients should be disregarded.  (Opp. at 7-9.)  These assertions do not appear anywhere in the Complaint.   Nor do they appear in any of the documents referenced in the Complaint which Plaintiff relies upon in his Opposition (*i.e.*, the First-Day Declaration, SEC Order, and SEC's complaint against F-Squared's former CEO).  (Opp. at 2 n.4)  Plaintiff cannot use this unalleged, extraneous material to bolster his Complaint.

## III.    Plaintiff Fails to Allege a Plausible Claim Under Section 548(a).

Plaintiff acknowledges that "it is not sufficient to merely 'allege the statutory elements' of fraudulent transfer."  (Opp. at 16.)  Yet Plaintiff does exactly that in parroting the text of Section 548(a).  (*Compare* Compl., ¶ 32 *with* 11 U.S.C. 548(a)(1)(B)(ii)).

### A.  Plaintiff Fails to Adequately Allege F-Squared Intended to Incur Debts Beyond Its Ability to Pay.

Plaintiff has no response to Defendants' argument that the Complaint lacks sufficient facts to plausibly allege F-Squared intended to incur debts beyond its ability to pay.  (Mem. at 15-16.)  Indeed, the Complaint says nothing about F-Squared's intention or belief. (*See* Compl.)  Accordingly, the Court should dismiss Plaintiff's claim based on Section 548(a)(1)(B)(ii)(III).

### B.  Plaintiff Fails to Adequately Allege F-Squared Was Undercapitalized.

As Defendants explain in their Memorandum, Plaintiff also fails to allege sufficient facts to show that the Transfers to Defendants caused F-Squared to have unreasonably small capital.  (Mem. at 12-15.)  In response, Plaintiff offers two conflicting but equally implausible theories of undercapitalization.[2]  (*See* Opp. at 22.)

On the one hand, Plaintiff argues that F-Squared was "always" undercapitalized.  (Opp. at 22.)  This argument apparently is based on the allegation that "F-Squared was insolvent from the inception of its use of the AlphaSector Index strategy."  (Compl., ¶ 16.)  F-Squared, however, began using the AlphaSector indexes years *before* the Transfers.  (*Compare* Mem., Ex. A *with id.*, Ex. B at 2.)  If, accepting the truth of Plaintiff's allegations, F-Squared was undercapitalized long before it made the Transfers, then the Transfers could not have *caused* F-Squared to be undercapitalized so as to render those Transfers voidable.  *See In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992) ("Where a debtor already has unreasonably small capital, that the debtor subsequently engaged in transfers which worsened, but did not

---

[2] Plaintiff's Opposition appears to address undercapitalization as part of his arguments regarding insolvency, rather than as a separate basis for liability under Section 548(a).  (*See* Opp. at 13-25.)  Undercapitalization and insolvency, however, are not synonymous.  *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992) ("[U]nreasonably small capital denotes a financial condition short of equitable solvency.").

cause, its financial infirmities, will not subject those transfers to avoidance as fraudulent conveyances").

On the other hand, Plaintiff argues that "[e]ven though F-Squared generated large quantities of cash during and after its fraudulent advertising campaign, this cash flow slowed to a trickle once F-Squared admitted to its fraud, and the company used much of the cash it had in its coffers to make the Transfers." (Opp. at 22.) This argument has three problems. First, none of the three paragraphs in the Complaint that Plaintiff cites to support this assertion alleges any causal nexus between the Transfers and F-Squared's purported undercapitalization. (*Id.* (citing Compl., ¶¶ 18, 20, 27).) Second, if F-Squared's cash flow slowed "once F-Squared admitted to its fraud," then the Transfers could not have caused F-Squared's alleged undercapitalization because F-Squared did not admit anything until it consented to the SEC Order months after the *last* Transfer. Third, the Complaint contains no factual support for the argument that F-Squared lacked the money to make the Transfers. The Transfers (which totaled less than $4 million over 13 months) ended in September 2014 (Mem., Ex. A), yet three months later F-Squared was able to pay $35 million to the SEC. (Compl., ¶¶ 14, 16.) Plaintiff's constructive fraudulent transfer claim based on Section 548(a)(1)(B)(ii)(II) is inherently implausible, and the Court should dismiss it.

### C. Plaintiff Fails to Adequately Allege F-Squared Was Insolvent at the Time of or as a Result of the Transfers to Defendants.

Plaintiff implicitly recognizes the problems discussed above, as the bulk of his Opposition is devoted to the third statutory basis for liability under Section 548(a)—insolvency at the time of or as a result of the Transfers to Defendants. U.S.C. § 548(a)(1)(B)(ii)(I). (Opp. at 14-22.) But here too, Plaintiff's allegations fail to state a plausible claim for constructive fraudulent transfer.

### 1.      Insolvency Must Be Plausibly Alleged.

Plaintiff begins by arguing that insolvency is a fact question not appropriate for resolution at the motion to dismiss stage, but this argument misses the point.  (Opp. at 13-14.) Plaintiff is not required to *prove* at the pleadings stage that F-Squared was insolvent but, under *Twombly/Iqbal*, Plaintiff must *allege* sufficient facts regarding F-Squared's financial condition to make a facially plausible case for its purported insolvency.  Plaintiff's cited cases do not hold otherwise.  *See*, *e.g.*, *In re Green Field Energy Servs., Inc.*, Adv. No. 15-50262 (KG), 2015 WL 5146161, at *7-*8 (Bankr. D. Del. Aug. 31, 2015) (denying motion to dismiss where complaint provided "extensive information" regarding debtor's financial condition, including that it incurred a 640% increase in funded debt obligations, operating losses of approximately $50-$100 million, and had a net working capital deficiency of approximately $333.4 million); *In re DBSI, Inc.*, 447 B.R. 243, 247-248 (Bankr. D. Del. 2011) (denying motion to dismiss where complaint alleged, *inter alia*, that debtors never generated a profit and that their liabilities exceeded their assets).

The Court also should reject Plaintiff's argument that he is not obligated to provide balance sheet or other specific financial information to show that F-Squared was insolvent.[3] (Opp. at 16-17.)   In the absence of financial information, Plaintiff must provide some other information regarding F-Squared's assets and debts to plead a plausible case for insolvency.  *See* 11 U.S.C. § 101(32) (defining "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation"); *In re United Tax Group, LLC*, Adv. No. 16-50088, 2016 WL 7235622, at *3-*4 (Bankr. D. Del. Dec. 13, 2016)

---

[3] Plaintiff "reserves the right to introduce, at the appropriate stage of these proceedings, specific financial information about F-Squared's insolvency."  (Opp. at 16 n.7.)  Plaintiff cannot argue for the plausibility of his claims based on information he has chosen to "reserve" rather than plead.

(Silverstein, J.) (plaintiff "must allege 'specific facts showing the debtor's financial position and the value of what was received in exchange for the transfer'") (internal citation omitted). Plaintiff has not done so.

> **2.    Plaintiff's Allegations Do Not Plead a Plausible Case for F-Squared's Insolvency.**

The only allegations in the Complaint regarding F-Squared's financial condition at or around the times of the Transfers are as follows:

- As of June 30, 2014, clients had $28.5 billion invested with F-Squared. (Compl., ¶ 13.)

- Between August 2013 and September 2014, F-Squared transferred less than $4 million to Defendants. (Compl., Ex. A; Mem., Ex. A.)

- On December 22, 2014, F-Squared agreed to entry of the SEC Order, under which it agreed to pay $35 million. (*Id.*, ¶ 14.)

- By March 31, 2015, four of F-Squared's largest clients left, representing a loss of $4.3 billion, more than 25% of F-Squared's assets then under management. (*Id.*, ¶ 18.)

These meager facts suggest F-Squared was doing well financially during the times that the Transfers were made and was still doing well (though less well than before) many months afterwards. Even its $35 million payment to the SEC came months *after* F-Squared made the last of the Transfers (which totaled less than $4 million). The Complaint thus fails to allege a plausible claim that F-Squared was insolvent at the time of or as a result of the Transfers.

Unable to allege financial facts plausibly showing insolvency, Plaintiff resorts to the conclusion that "at all relevant times, F-Squared generated a great majority of its revenue by means of illegal activity almost certain to give rise, at some point, to massive liabilities on account of that activity, and so F-Squared was *insolvent from the inception* of its use of the AlphaSector Index strategy." (Compl., ¶ 16 (emphasis added).) This conclusion fails to meet the *Twombly/Iqbal* standard. *See Fowler*, 578 F.3d at 210-211 ("The District Court must accept

all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions"); *In re United Tax Group*, 2016 WL 7235622, at *4 (holding that the allegation that "[t]he Debtor's records, including the Debtor's tax returns, suggest that the Debtor was insolvent on a 'balance sheet' basis" was "too conclusory" to state a plausible fraudulent transfer claim).

Plaintiff's "insolvent from the inception" theory cannot be squared with Plaintiff's allegation that "*[a]s a result of* the [SEC] Order, F-Squared was no longer a viable business and was no longer able to operate with its remaining capital." (Compl., ¶ 21.)  The Transfers could *not* have caused F-Squared's insolvency if, as Plaintiff claims, either F-Squared was already insolvent or a later event caused the insolvency.  Plaintiff's Opposition offers no explanation for this contradiction.

Plaintiff's "insolvent from the inception" theory is also defective for other reasons. Plaintiff argues that because F-Squared misleadingly advertised its indexes, it had "massive liabilities on account of that activity that *would be* asserted *once* the fraud was uncovered," thereby retroactively rendering it insolvent at the time of the Transfers.  (Opp. at 15 (emphasis added).)   This argument relies on many contingencies: (1) F-Squared's misconduct being discovered and not being timely corrected; (2) the SEC bringing an enforcement action against F-Squared; (3) the SEC then taking enforcement action against F-Squared's customers; (4) F-Squared's customers then asserting indemnification claims against F-Squared; and (5) all of those claims inflating into "massive liabilities."   Plaintiff treats these *contingencies* as *certainties*.  (Opp. at 18-25.)   In doing so, Plaintiff impermissibly relies on hindsight bias to transform the possibility of F-Squared's insolvency at the time of the Transfers into an inevitability.  This he cannot do.

### i.    Plaintiff Confuses Impermissible Hindsight Bias With Permissible Use of Subsequently Discovered Information.

Under Third Circuit precedent, hindsight bias cannot be used to establish insolvency. (Mem. at 11-12.)  Plaintiff acknowledges this rule.  (*See* Opp. at 22-25.)  He argues, however, that Defendants "incorrectly conflate" impermissible hindsight bias with the permissible use of subsequently discovered information that sheds light on a debtor's assets and liabilities in determining solvency.  (*Id.* at 23.)  Defendants do not; it is Plaintiff who confuses the two rules.

Defendants agree that later-learned information can be used to assess solvency at an earlier point.  However, that later-learned information must be evaluated through the lens of what was reasonably foreseeable *at the time of* the challenged transfers.  In other words, that information must be discounted to avoid hindsight bias.  *See In re Trans World Airlines, Inc.*, 134 F.3d 188, 198 (3d Cir. 1998) (contingent liabilities "must be limited to costs arising from foreseeable events that might occur while the debtor remains a going concern").

*In re Edgewater Med. Ctr.*, 373 B.R. 845 (Bankr. N.D. Ill. 2007), a case that Plaintiff cites, illustrates why subsequent events must be discounted by the likelihood they would actually occur to avoid hindsight bias.  (Opp. at 24.)  There, the plaintiff advanced a similar theory to the one argued by Plaintiff here—that although the debtor's assets seemed to outweigh its debts, the debtor was nonetheless insolvent because "had the debtor's Medicare fraud been discovered it would have had devastating financial consequences for the debtor."  *Id.* at 854.  The bankruptcy court rejected that theory as speculative and reasoned as follows:

> Had the government discovered the Medicare fraud that was occurring and had the government completely ceased making payments to the debtor, then perhaps the debtor would have been rendered insolvent.  Perhaps that is what would have happened; perhaps that is even what *likely* would have happened.  To reach a finding of insolvency, however, the court would have to disregard the large amounts of cash the debtor had on hand and *speculate* on what the Department of Human Services would have done if it had discovered the Medicare fraud.  The

court declines to engage in that type of speculation and finds and concludes that
the plaintiff has not met its burden of proving insolvency.

*Id.* at 855 (emphases in original).

Here, as in *Edgewater*, it was not inevitable at the time of the Transfers that all of the
subsequent, intervening events culminating in F-Squared's bankruptcy—the SEC's taking
enforcement action against F-Squared, F-Squared's consenting to entry of the SEC Order, the
SEC's taking enforcement action against F-Squared's clients, those clients deciding to stop
investing with F-Squared and seeking indemnification from it—would actually happen. Plaintiff
does not allege any facts in the Complaint or cite any case law in his Opposition to substantiate
his theory of inevitability. Rather, these events, which were precipitated by the actions of
independent third parties, were unforeseeable but for Plaintiff's use of hindsight bias.

### ii. Plaintiff Cannot Use the SEC's Actions to Show F-Squared Was Inevitably Doomed.

Plaintiff's inevitability theory relies on the SEC's not only discovering F-Squared's
misconduct but also deciding to take action against it and its customers. The Complaint contains
no allegations to show any of these events was inevitable at the time of the Transfers.

Plaintiff asserts that there was "securities fraud underlying [F-Squared's] entire business"
to suggest F-Squared was engaged in a criminal enterprise that would inevitably be discovered
and punished. (Opp. at 21.) The allegations in the Complaint do not support this claim. F-
Squared's business—selling its investment strategy to institutional clients who invested their
own client's funds using the strategy—was a legitimate and successful one. (*See* Compl., ¶¶ 8,
13; First-Day Decl., ¶¶ 6-7.) As even Plaintiff acknowledges, F-Squared was not a Ponzi
scheme. (Opp. at 21 n.8.) Where F-Squared went wrong was in misadvertising its AlphaSector
indexes. (Mem., Ex. B at 4.) The SEC did not find anything wrong with F-Squared's indexes
themselves nor did it order F-Squared to stop using those indexes. (*See id.*) Plaintiff cannot

transform F-Squared's agreement to disgorge profits and pay a fine for misleading advertisements into a finding that F-Squared's entire operation was illegal.  Had that been the case, the SEC would have demanded more than disgorgement and a fine—it would have shut F-Squared down altogether.  But that did not happen.

Even accepting that F-Squared's advertising was illegal, it was far from certain that the SEC would exercise its discretion to prosecute F-Squared.  *See* 15 U.S.C. § 78u(a) ("The Commission may, in its discretion, make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter"); *Kixmiller v. Sec. & Exch. Comm'n*, 492 F.2d 641, 645 (D.C. Cir. 1974) ("An agency's decision to refrain from any investigation or enforcement action is generally unreviewable and, as to the agency before us, the specifications of the Act leave no doubt on that score").  Plaintiff does not allege anything regarding the SEC's enforcement priorities or other information to allow for the inference that the SEC was *certain* to pursue enforcement proceedings against F-Squared.

Nor is it likely that F-Squared would have consented to entry of the SEC Order had it thought that doing so would result in "massive liabilities" that might render it insolvent.  Indeed, if F-Squared had anticipated that cooperating with the SEC would precipitate its downfall less than a year later, it is implausible that F-Squared would have cooperated.  Under *Iqbal*, the Complaint fails to allege facts from which a plausible inference can be made that F-Squared would opt to sign its own death warrant.

The Complaint also fails to allege any facts showing that the SEC's decision to go after F-Squared's customers was inevitable.  After all, it was F-Squared who used misleading advertising and F-Squared already had been punished to the tune of $35 million.  Plaintiff alleges

that the SEC "opened investigations into certain of [F-Squared's] clients for securities fraud related to their *use* of the AlphaSector strategy" (Compl., ¶ 19) but, as discussed above, there was nothing wrong with *using* the strategy; it was F-Squared's advertising that was improper.

Plaintiff's theory of inevitability lacks support from the factual allegations of the Complaint. The fact that certain events did ultimately occur does not mean that, at the time of the Transfers, they were bound to occur.

### iii. Properly Discounted, F-Squared's Contingent Liabilities Did Not Render It Insolvent.

As of the dates of the Transfers, which took place well before F-Squared fell on hard times, any and all claims that the SEC and/or F-Squared's clients had against it were contingent ones. *See In re Frenville Co., Inc.*, 744 F.2d 332, 336 n.7 (3d Cir. 1984) ("Bankruptcy judges have defined a contingent claim as a claim which becomes due only on the occurrence of a future event"), *overruled on other grounds by In re Grossman's Inc.*, 607 F.3d 114 (3d Cir. 2010); *see also Black's Law Dictionary* (10th ed. 2014) (defining contingent claim as a "claim that has not yet accrued and is dependent on some future event that may never happen"). Plaintiff's allegation that F-Squared's conduct was "*almost certain* to give rise, *at some point*, to massive liabilities" acknowledges the contingent nature of those liabilities. (Compl., ¶ 16 (emphasis added).)

In assessing insolvency, "contingent liabilities must be limited to costs arising from foreseeable events that might occur while the debtor remains a going concern." *Trans World Airlines*, 134 F.3d at 198; *see also In re R.M.L., Inc.*, 92 F.3d 139, 156 (3d Cir. 1996) ("[I]f a debtor's treatment of an item as an 'asset' depends for its propriety on the occurrence of a contingent event, a court must take into consideration the likelihood of that event occurring from an objective perspective"); *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 693 (7th Cir. 2010)

("Hindsight is wonderfully clear, but in determining the Hospital's solvency in mid-1997 it was necessary to determine the expected value of this liability as of mid-1997, not the actual value as of 1999 or 2000.").

Perhaps Judge Posner put it best in *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 199-200 (7th Cir. 1988).  He observed that it was "absurd" to suggest that every person or company with "contingent liabilities greater than his or its net assets was insolvent," because, by definition, "a contingent liability is not certain – and often is highly unlikely – ever to become an actual liability." *Id.*  Accordingly, "[t]o value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real." *Id.*  A contingent liability "must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities." *Id.*

As explained in Defendants' initial Memorandum (Mem. at 12), nothing in the Complaint suggests that, at the time F-Squared made the Transfers to Defendants (from August 2013 to September 2014), it was reasonably foreseeable that F-Squared would eventually incur a "massive amount" of liabilities, beginning with the SEC Order (in December 2014) and culminating with indemnification claims filed after F-Squared declared bankruptcy (in June 2015).  Plaintiff does not dispute this lack of foreseeability in his Opposition.

Rather, Plaintiff argues that F-Squared's liabilities arose at the time of its misconduct and that those liabilities existed even if F-Squared was unaware of them.  (Opp. at 18-20.)  Once again, Plaintiff misses the point.  The question is not whether F-Squared *had* contingent liabilities, but rather the extent to which those liabilities should factor into the analysis of F-Squared's solvency at the time of the Transfers.  The Complaint fails to allege facts from which

the inference can be made that, at the time of the Transfers, it was reasonably foreseeable that F-Squared's contingent liabilities would render it insolvent.

Plaintiff attempts not only to inflate the value of F-Squared's liabilities but also to discount the value of F-Squared's assets, arguing that "any value ascribed to goodwill, or any valuation of F-Squared's assets on a going-concern basis, is dramatically over-valued to the extent that such valuation does not take into account the result of the discovery of F-Squared's fraud."  (Opp. at 22.)  But again, this argument is not supported by the allegations in the Complaint.  Plaintiff never alleges what F-Squared's assets were, much less how they should have been valued.

As a factual matter, F-Squared's primary assets were the AlphaSector indexes and the asset management fees generated by those indexes.  (*See* Compl., ¶ 16.)  There was nothing fraudulent about the indexes or the strategies underlying those indexes; indeed, the AlphaSector indexes outperformed the S&P 500 index.  (Mem., Ex. A at 2.)  That F-Squared improperly *advertised* the performance of the indexes does not diminish the intrinsic value of the indexes themselves.  In fact, the SEC Order did *not* prohibit or otherwise censure F-Squared's actual *use* of the indexes.  (*See* Mem., Ex. B.)  Clients may have initially invested with F-Squared due to its false advertising, but they *stayed* clients because the indexes generated actual and attractive returns.

As a legal matter, neither of Plaintiff's two cited cases supports his argument that F-Squared's assets should be discounted because of its subsequently discovered fraud.  (Opp. at 22.)  *In re Adelphia Comm'ns Corp.*, 512 B.R. 447 (Bankr. S.D.N.Y. 2014) merely states the general rule that subsequent discovery of fraud can be considered in the insolvency analysis, but goes on to hold that the debtor was *not* insolvent.  *In re Centaur, LLC*, Adv. No. 12-50423

(KJC), 2013 WL 4479074 (Bankr. D. Del. Aug. 19, 2013) does not involve any subsequently discovered fraud and actually supports Defendants' argument that contingent assets and liabilities must be discounted to their then-expected values. *See id.*, 2013 WL 4479074, at \*4 (alleging value of proposed race track was overestimated and revenue projections were highly speculative because they were based on a prospective acquisition of a gaming license which never occurred).  At the time of the Transfers, F-Squared's assets were intact and the possibility of its clients' subsequently deserting it as a result of the SEC Order and the SEC's prosecuting those clients was remote.

Because Plaintiff has not plausibly alleged that F-Squared was insolvent at the time of or as a result of the Transfers to Defendants, his constructive fraudulent transfer claim based on Section 548(a)(1)(B)(ii)(I) should be dismissed.

**IV.    Plaintiff Fails to Allege Plausible Claims Under Section 544(b) and State Law and Section 550.**

Plaintiff concedes that his constructive fraudulent transfer claim under Section 544(b) and state law is identical to his claim under Section 548(a) and that and his recovery claim under Section 550 hinges on the viability of those two predicate claims.  (Opp. at 25 n.9.)  Thus, because the Section 548(a) claim fails, so too do Plaintiff's remaining two claims.

## CONCLUSION

For the reasons stated above and in Defendants' Memorandum, the Court should dismiss Plaintiff's Complaint in its entirety.

[*Signature follows*]

- 15 -

Dated: January 18, 2018       Respectfully submitted,

*/s/ Eric D. Schwartz*
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Eric D. Schwartz (DE Bar No. 3134)
1201 North Market Street
Wilmington, DE 19899
Tel: (302) 658-9200

— and —

SCHIFF HARDIN LLP
J. Mark Fisher, *pro hac vice pending*
Walter C. Greenough
233 S. Wacker Drive, Suite 7200
Chicago, IL 60606
Tel: (312) 258-5500

*Counsel for Defendants*